# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSEPH CACCIAPELLE and MELVIN BAREISS , On Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION, FEDERAL HOME LOAN MORTGAGE CORPORATION, and FEDERAL HOUSING FINANCE ADMINISTRATION, as Conservator of Federal National Mortgage Association and Federal Home Loan Mortgage Corporation,<br><br>Defendants. | Case No. _____<br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Joseph Cacciapelle and Melvin Bareiss (collectively, "Plaintiffs"), by the undersigned attorneys, submit this Class Action Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a class action brought by Plaintiffs on behalf of themselves and a class (the "Class," as defined herein) of holders of preferred stock issued by either the Federal National Mortgage Association ("Fannie Mae" or "Fannie") or the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie"), seeking damages from Fannie Mae and Freddie Mac for breach of contract and breach of the implied covenant of good faith and fair dealing. This complaint also seeks damages from the Federal Housing Finance Administration ("FHFA"), as

conservator ("Conservator") for both Fannie and Freddie.  The background and essential facts relevant to all of these claims is summarized below.

2.      In September of 2008, the United States Government (the "Government"), acting through the FHFA, placed Fannie Mae and Freddie Mac into conservatorship, putting them under the control of the FHFA, which is an agency of the Government.  However, by placing Fannie and Freddie into conservatorship, and *not* into receivership, the FHFA committed to the continued operation of Fannie and Freddie, rather than their liquidation (as would have occurred under receivership).  Moreover, while Fannie and Freddie were fully controlled by FHFA during the conservatorship, they continued to exist as independent corporate entities, with their own boards of directors, and the FHFA made clear that the common and preferred stock in Fannie and Freddie would remain outstanding.  Indeed, the whole point of conservatorship (as opposed to receivership and liquidation) is to restore the companies to a stable and secure position, so that the conservatorship can end and the companies can be returned to normal business operations. At the time of the conservatorship, that is how the FHFA described the goal of the conservatorship, and that is why the FHFA stated that common and preferred stock would remain outstanding.  Thus, the stock of Fannie and Freddie has continued to be publicly traded since the conservatorship, and Fannie and Freddie have continued to make SEC filings, even as they have remained under the full control of the FHFA.

3.      In connection with the conservatorships, the Government (specifically, the U.S. Treasury) entered into substantially identical Preferred Stock Purchase Agreements (the "Agreements") with both Fannie Mae and Freddie Mac.  Under these Agreements, the Treasury acquired from each company preferred stock (the "Senior Preferred Stock") that (i) is senior in priority to all other series of Fannie Mae and Freddie Mac preferred stock (all such other series

of Fannie and Freddie preferred stock shall be referred to as the "Junior Preferred Stock"), (ii) was given an initial face value of $1 billion, but also provided that this face value would be increased by any amount the Treasury invested in or advanced to Fannie Mae or Freddie Mac, (iii) would receive preferential liquidation rights (*i.e.*, would receive face value, as increased by any Treasury investments or advances, as a liquidation preference prior to anything going to the holders of Junior Preferred Stock or Common Stock), and (iv) would earn an annual dividend of 10% of the face value (as increased by any Treasury investments or advances). In addition, each of the Agreements provided the Treasury with warrants that could be exercised at any time to allow the Treasury to acquire 79.9% of the Common Stock of Fannie and Freddie, respectively, for a nominal price.

4.     Between the start of the conservatorship in September 2008 through the beginning of 2012, the Government advanced Fannie Mae and Freddie Mac more than $188 billion—most of which was advanced to cover accounting losses reflecting excessive write-downs of assets that have turned out to be worth far more than their written down amounts. These advances increased the face value of the Senior Preferred Stock held by the Government to approximately $189 billion, entitling the Government to an annual dividend of approximately $19 billion, which translates to a quarterly dividend of just under $5 billion.

5.     By 2012 the housing market was well on its way to recovery and Fannie Mae and Freddie Mac had become profitable again, reporting increasing profits through 2011 and 2012. Indeed, by the second quarter of 2012, Fannie and Freddie made a combined quarterly profit of approximately $8.3 billion. This was the first quarter for which Fannie and Freddie reported a combined quarterly profit that exceeded the (just under) $5 billion quarterly dividend payable to the Treasury on its Senior Preferred Stock. Thus, by no later than the end of the second quarter

of 2012, Fannie and Freddie were generating sufficient profits to pay a dividend to the holders of their Junior Preferred Stock. And there was ample cause to expect that those profits were likely to grow substantially, as they in fact have done during the past year. The Government was well-positioned to enjoy the benefit of those profits, since it was entitled to the 10% cumulative dividend on its Senior Preferred Stock, and to 79.9% of any dividends distributed to the common stock (which it had the right to acquire at a nominal price). However, the Government was not content with this—perhaps because the dividends on the 79.9% of common it effectively owned could not be paid until after dividends were paid on the privately-held Junior Preferred Stock. Thus, rather than allow any dividends to be distributed to the Junior Preferred Stockholders, Fannie, Freddie, and the Government acted immediately in August 2012 to eliminate the rights of the holders of Junior Preferred Stock to *ever* receive *any* distribution of value from Fannie or Freddie.

6.     Specifically, on August 17, 2012, Fannie Mae and Freddie Mac, through their Conservator FHFA, amended the terms of their Agreements with the Treasury to provide that beginning on January 1, 2013, Fannie Mae and Freddie Mac would pay the Government dividends equal to their entire net worth (the "Net Worth Sweep"), leaving Fannie Mae and Freddie Mac with no funds to redeem the Government's Senior Preferred Stock or to distribute to the holders of Junior Preferred Stock, whether by dividend, redemption, or in a liquidation. Indeed, since the Government's Preferred Stock Purchase Agreements provided that in the event of a liquidation of Fannie or Freddie, the Government would receive a liquidation preference that included the amount of any prior unpaid dividend, the Net Worth Sweep guaranteed that even if Fannie or Freddie were liquidated (which is not the purpose of the conservatorship, and which

the FHFA has never announced plans to do) the Government (*i.e.*, Treasury) would receive the full amount of the institutions' net worth in that liquidation.

7.    The August 2012 action, which Fannie, Freddie, and the Government effectuated without seeking or obtaining the consent of the Junior Preferred Stockholders as required by the terms of the Junior Preferred Stock, eliminated the valuable contractual rights owned by the holders of Junior Preferred Stock.  Specifically, the rights of the Junior Preferred Stockholders that were nullified by the Government's action included the rights:

   a.  to receive dividend payments from Fannie Mae and Freddie Mac. Dividends were owed to the Junior Preferred Stockholders to the extent Fannie and Freddie had profits in excess of the amount required to pay dividends to the Government on its Senior Preferred Stock.  In such a scenario, no dividends could be paid to holders of common stock, including the Government's 79.9% stake in such common stock, without first paying dividends to the Junior Preferred Stockholders.  As of the second quarter of 2012, ensuing quarters to the date of this filing, and for most if not all quarters for the foreseeable future, Fannie and Freddie's profits in fact exceeded such amounts;

   b.  to receive a liquidation distribution upon dissolution, liquidation, or winding up of Fannie Mae and Freddie Mac, which while junior to the Senior Preferred Stock was still worth billions of dollars, given Fannie and Freddie's return to profitability and the rebound in the housing market; and

   c.  to otherwise participate, even to a limited extent, in the profits of Fannie and Freddie, whether through dividends, redemptions, liquidation, or otherwise; and

   d.  to vote on any changes to the Junior Preferred Stock that were materially adverse to the Junior Preferred Stockholders.

8.    Plaintiffs and other members of the Class paid valuable consideration to acquire these rights, and in doing so helped provide financial support for Fannie and Freddie, both before and after the conservatorship, by contributing to a viable market for Fannie's and Freddie's

issued securities. Indeed, the contractual rights owned by the holders of Junior Preferred Stock were worth billions of dollars prior to being eliminated in August 2012.

9.      Fannie and Freddie breached their contracts with the Junior Preferred Stockholders and breached the covenant of good faith and fair dealing inherent in those contracts by eliminating the Junior Preferred Stockholders' contractual rights without their consent. By causing these breaches through its conduct as Conservator, FHFA is also liable for Fannie and Freddie's breach of contract and breach of the implied covenant of good faith and fair dealing.

10.     The current projections for Fannie and Freddie's continued profitability show that over approximately the next year, Fannie and Freddie will be able to repay to the Treasury 100% of the money they received from the Treasury, plus the required 10% annual dividend. That means that but for the Net Worth Sweep, Fannie and Freddie would be in position to pay billions of dollars in profits to the holders of Junior Preferred Stock for years to come. Instead, because of the Net Worth Sweep, the Treasury will now receive tens of billions of dollars (if not hundreds of billions of dollars) in excess of the amount it was entitled to receive under the original Agreements, and the Junior Preferred Stockholders will receive nothing.

11.     On July 10, 2013, the above-named Plaintiffs filed a class action complaint in the Court of Federal Claims ("CFC Complaint") seeking just compensation from the United States for the appropriation of their property rights caused by the August 2012 Third Amendment. This case advances alternative claims for relief based on the same conduct alleged in Plaintiffs' CFC Complaint. The CFC Complaint alleges that the Third Amendment was not an arm's length agreement entered into by two independent parties, but instead was imposed by two arms of the Government (the Treasury and the FHFA) acting in concert, and therefore was a unilateral action taken by the Government to appropriate the private property rights held by the Junior Preferred

Stockholders. This complaint alleges that the Third Amendment was also a contractual breach by Fannie Mae and Freddie Mac of the Fannie and Freddie agreements governing all of the Junior Preferred Stock.

12. Plaintiffs do not seek a double recovery; but they do seek to ensure that the Plaintiffs and the Class receive the compensation they are owed—either as just compensation paid by the Government for its appropriation of their private property (the CFC Complaint) or as breach of contract damages paid by Fannie, Freddie, and/or FHFA. Moreover, to the extent the Government seeks to defend the CFC Complaint by claiming that the FHFA was not acting as an arm of the Government when it agreed to the Third Amendment, then it must concede that FHFA, Fannie, and Freddie can be sued as non-governmental entities in this case. By contrast, to the extent the defendants in this case assert immunity based on the FHFA's status as a government agency, that will confirm that the Third Amendment was the unilateral act of the Government, and thereby confirm the allegations of the CFC Complaint.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 12 U.S.C. §§ 1452(c), 1723a(a), and 4617. In addition, this Court has subject matter jurisdiction under 28 USC 1332(d)(2)(A) in that plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $5 million, exclusive of interests and costs. The Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

14. Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either

resides in or maintains executive offices in this district, and defendants have engaged in numerous activities and conducted business here, which had an effect in this district.

## THE PARTIES

15.    Plaintiff Joseph Cacciapelle, a citizen of the State of New Jersey, is a holder of Fannie Mae Junior Preferred Stock and Freddie Mac Junior Preferred Stock, was a holder of Fannie Mae Junior Preferred Stock and Freddie Mac Junior Preferred Stock prior to September 6, 2008, including prior to and on August 17, 2012, and has been a holder of Fannie Mae Junior Preferred Stock and Freddie Mac Junior Preferred Stock continuously since then.

16.    Plaintiff Melvin Bareiss, a citizen of the State of Kansas, is a holder of Fannie Mae Junior Preferred Stock, was a holder of Fannie Mae Junior Preferred Stock prior to September 6, 2008, including prior to and on August 17, 2012, and has been a holder of Fannie Mae Junior Preferred Stock continuously since then.

17.    Defendant Fannie Mae is a federally chartered Government-Sponsored Enterprise ("GSE") with its principal executive offices located at 3900 Wisconsin Avenue, NW, Washington, DC, and therefore is a citizen of the District of Columbia.

18.    Defendant Freddie Mac is a federally chartered GSE with its principal executive offices located at 8200 Jones Branch Drive, McLean, Virginia, and therefore is a citizen of the Commonwealth of Virginia.

19.    Defendant FHFA, as Conservator of Fannie Mae and Freddie Mac, is a Government agency with its headquarters located at 400 Seventh Street, SW, Washington, DC, and therefore is a citizen of the District of Columbia.

## CLASS ACTION ALLEGATIONS

20.     Plaintiffs bring this action on their own behalf and as a class action on behalf of those who held shares of Fannie Mae and/or Freddie Mac Junior Preferred Stock prior to, and as of, the public announcement of the Net Worth Sweep on August 17, 2012 (the "Class").

21.     This action is properly maintainable as a class action.

22.     The Class is so numerous that joinder of all members is impracticable. As of August 17, 2012, there were hundreds of millions of shares of Fannie Mae and Freddie Mac Junior Preferred Stock outstanding. Upon information and belief, there are thousands of members of the Class.

23.     There are questions of law and fact which are common to the Class, including, but not limited to:

> a.     Whether defendants breached their contracts with Plaintiffs and the members of the Class and breached the implied covenants of good faith and fair dealing inherent in those contracts; and
>
> b.     Whether defendants are liable for damages to Class members for defendants' breaches of contract and breaches of the implied covenant of good faith and fair dealing.

24.     Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are typical of claims of the other members of the Class and Plaintiffs have the same interests as the other members of the Class, all of whom seek damages for defendants' breaches of contract and breaches of the implied covenant of good faith and fair dealing, which affected all Fannie Mae and Freddie Mac Junior Preferred Stockholders in the same manner. Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class, including the holders of all series of Fannie Mae and Freddie Mac Junior Preferred Stock, all of

whom suffered the same injury to their contractual rights to receive dividends, liquidation distributions, or any other form of distribution on their Junior Preferred Stock.

25.     The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to the individual Class members that would establish incompatible standards of conduct for defendants.

26.     Defendants have acted on grounds that apply generally to the Class, such that relief is appropriate respecting the Class as a whole.  The Net Worth Sweep was a breach of contract and breach of the implied covenant of good faith and fair dealing that unlawfully eliminated the rights of *all* Fannie Mae and Freddie Mac Junior Preferred Stockholders who owned Junior Preferred Stock as of August 17, 2012.

27.     The questions of law and fact common to the members of the Class predominate over any questions affecting only its individual members, such that a class action is superior to any other available method for fairly and efficiently adjudicating the controversy.

## Background of Fannie Mae, Freddie Mac, and Their Preferred Stock

28.     Fannie Mae was created by federal statute in 1938, at the request of President Franklin Delano Roosevelt, in an effort to provide a much needed supply of capital to the nation's home mortgage industry.  Initially, it was authorized to purchase only those mortgages which were insured by the Federal Housing Administration ("FHA").  For the first thirty years of its existence, Fannie Mae existed and was operated by the Federal Government.

29.     In 1968, Fannie Mae was privatized pursuant to the Housing and Urban Development Act of 1968.   That Act effectively partitioned the Federal National Mortgage Association into two separate and distinct entities: the reconstituted Fannie Mae and the Government National Mortgage Association ("Ginnie Mae").  Fannie Mae was reorganized as a

Government-sponsored private corporation and was to serve the self-supporting secondary mortgage market.  It was also authorized to purchase mortgages beyond merely FHA-insured mortgages.  The other entity, Ginnie Mae, continued as a Federal Agency and was responsible for the then-existing special assistance programs.

30.    From 1968 until the events described in this Complaint, Fannie Mae has been publicly traded on the New York Stock Exchange and therefore owned by private shareholders, and has obtained funding from private capital on a self-sustaining basis.

31.    In the Emergency Home Finance Act of 1970, Congress created Freddie Mac and authorized it to create a secondary market for conventional mortgages.  According to its Form 10-K for the fiscal year ended December 31, 2012, filed with the Securities and Exchange Commission ("SEC") on February 28, 2013, Freddie Mac's "public mission [is] to provide liquidity, stability, and affordability to the U.S. housing market."

32.    In 1992, Congress passed the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (the "Safety and Soundness Act").  The Safety and Soundness Act created the Office of Federal Housing Enterprise Oversight ("OFHEO") as the new regulator for Fannie Mae and Freddie Mac, imposed minimum capital requirements on Fannie Mae and Freddie Mac, and provided OFHEO with the authority to impose a conservatorship in the event that Fannie Mae or Freddie Mac became critically undercapitalized, as defined by the statute.

33.    In July of 2008, Congress enacted the Housing and Economic Recovery Act of 2008 (the "2008 Act").  The 2008 Act created the FHFA as the successor to OFHEO, and provided the FHFA with expanded regulatory powers over Fannie Mae and Freddie Mac.  In addition, the 2008 Act authorized the FHFA to order either of the GSEs into receivership, as well

as providing greater guidance regarding the statutory basis for appointing a conservator for either of the GSEs.

34.    Although they are charted by Congress and have a public mission, prior to September 6, 2008, Fannie Mae and Freddie Mac were non-governmental, publicly traded corporations owned by their stockholders.  Prior to September 6, 2008, both Fannie Mae and Freddie Mac raised substantial amounts of capital from private investors in order to fund their operations.  As shown below, one of the ways both Fannie Mae and Freddie Mac raised capital was by issuing preferred stock.

35.    Prior to September 6, 2008, Fannie Mae had issued several series of preferred stock with various dividend rates and stated values, including:

     a.     Series D 5.25% Non-Cumulative Preferred Stock with a stated value of $50 per share;

     b.     Series E 5.1% Non-Cumulative Preferred Stock with a stated value of $50 per share;

     c.     Series F Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

     d.     Series G Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

     e.     Series H 5.81% Non-Cumulative Preferred Stock with a stated value of $50 per share;

     f.     Series I 5.375% Non-Cumulative Preferred Stock with a stated value of $50 per share;

     g.     Series L 5.125% Non-Cumulative Preferred Stock with a stated value of $50 per share;

     h.     Series M 4.75% Non-Cumulative Preferred Stock with a stated value of $50 per share;

     i.     Series N 5.5% Non-Cumulative Preferred Stock with a stated value of $50 per share;

j.      Series O Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

k.      Series P Variable Rate Non-Cumulative Preferred Stock with a stated value of $25 per share;

l.      Series Q 6.75% Non-Cumulative Preferred Stock with a stated value of $25 per share;

m.      Series R 7.625% Non-Cumulative Preferred Stock with a stated value of $25 per share;

n.      Series S Variable Rate Non-Cumulative Preferred Stock with a stated value of $25 per share;

o.      Series T 8.25% Non-Cumulative Preferred Stock with a stated value of $25 per share; and

p.      Series 2004-1 5.375% Non-Cumulative Convertible Preferred Stock with a stated value of $100,000 per share.

36.      Prior to September 6, 2008, Freddie Mac had issued several series of preferred stock with various dividend rates and stated values, including:

a.      Series B Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

b.      5.81% Non-Cumulative Preferred Stock with a stated value of $50 per share (issued 10/27/97);

c.      Series F 5% Non-Cumulative Preferred Stock with a stated value of $50 per share;

d.      Series G Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

e.      Series H 5.1% Non-Cumulative Preferred Stock with a stated value of $50 per share;

f.      5.3% Non-Cumulative Preferred Stock with a stated value of $50 per share (issued 10/28/98);

g.      5.1% Non-Cumulative Preferred Stock with a stated value of $50 per share (issued 3/19/99);

h.      Series K 5.79% Non-Cumulative Preferred Stock with a stated value of $50 per share;

i.      Series L Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

j.      Series M Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

k.      Series O 5.81% Non-Cumulative Preferred Stock with a stated value of $50 per share;

l.      Series P 6% Non-Cumulative Preferred Stock with a stated value of $50 per share;

m.     Series Q Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

n.      Series R 5.7% Non-Cumulative Preferred Stock with a stated value of $50 per share;

o.      5.81% Non-Cumulative Preferred Stock with a stated value of $50 per share (issued 1/29/02);

p.      Series S Variable Rate Non-Cumulative Preferred Stock with a stated value of $50 per share;

q.      Series T 6.42% Non-Cumulative Preferred Stock with a stated value of $50 per share;

r.      Series U 5.9% Non-Cumulative Preferred Stock with a stated value of $25 per share;

s.      Series V 5.57% Non-Cumulative Preferred Stock with a stated value of $25 per share;

t.      Series W 5.66% Non-Cumulative Preferred Stock with a stated value of $25 per share;

u.      Series X 6.02% Non-Cumulative Preferred Stock with a stated value of $25 per share;

v.      Series Y 6.55% Non-Cumulative Preferred Stock with a stated value of $25 per share; and

w.     Series Z Fixed-to-Floating Rate Non-Cumulative Preferred Stock with a stated value of $25 per share.

37.     As shown below, prior to September 6, 2008, each series of Fannie Mae preferred stock ranked on a parity with all other issued and outstanding series of Fannie Mae preferred stock as to the payment of dividends and the distribution of assets upon dissolution, liquidation, or winding up of Fannie Mae, and each series of Freddie Mac preferred stock ranked on a parity with all other issued and outstanding series of Freddie Mac preferred stock as to the payment of dividends and the distribution of assets upon dissolution, liquidation, or winding up of Freddie Mac.  Thus, the holders of each series of Fannie Mae and Freddie Mac preferred stock had equal contractual rights to receive their respective dividends, as well as their respective liquidation preferences (or their respective pro rata portions thereof) upon dissolution, liquidation, or winding up of Fannie Mae and Freddie Mac.

38.     Prior to September 6, 2008, Fannie Mae and Freddie Mac each regularly declared and paid dividends on each series of their respective preferred stock.

39.     The Certificate of Designation for each series of Fannie Mae preferred stock constitutes a contract with provisions governing the holders' dividend and liquidation rights, and provides in pertinent part:

**2. Dividends.**

(a) Holders of record of [the particular series of] Preferred Stock (each individually a "Holder," or collectively the "Holders") will be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion out of funds legally available therefor, non-cumulative cash dividends at [the specified percentage rate] per annum of the [specified] stated value . . . per share of [the particular series of] Preferred Stock.

* * *

-15-

**4. Liquidation Rights.**

(a) Upon any voluntary or involuntary dissolution, liquidation or winding up of Fannie Mae, after payment or provision for the liabilities of Fannie Mae and the expenses of such dissolution, liquidation or winding up, the Holders of outstanding shares of the [particular series of] Preferred Stock will be entitled to receive out of the assets of Fannie Mae or proceeds thereof available for distribution to stockholders, before any payment or distribution of assets is made to holders of Fannie Mae's common stock (or any other stock of Fannie Mae ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, junior to the [particular series of] Preferred Stock), the amount of [the stated value] per share plus an amount . . . equal to the dividend (whether or not declared) for the then-current quarterly Dividend Period accrued to but excluding the date of such liquidation payment, but without accumulation of unpaid dividends on the [particular series of] Preferred Stock for prior Dividend Periods.

(b) If the assets of Fannie Mae available for distribution in such event are insufficient to pay in full the aggregate amount payable to Holders of [the particular series of] Preferred Stock and holders of all other classes or series of stock of Fannie Mae, if any, ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, on a parity with the [particular series of] Preferred Stock, the assets will be distributed to the Holders of [the particular series of]  Preferred Stock and holders of all such other stock pro rata, based on the full respective preferential amounts to which they are entitled (but without, in the case of any noncumulative preferred stock, accumulation of unpaid dividends for prior Dividend Periods).

40.    Likewise, the Certificate of Designation for each series of Freddie Mac preferred stock constitutes a contract with provisions governing the holders' dividend and liquidation rights, and provides in pertinent part:

**2. Dividends**

(a) Holders of outstanding shares of Non-Cumulative Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, non-cumulative cash dividends at the [specified] annual rate per share of Non-Cumulative Preferred Stock.

\* \* \*

### 7. Liquidation Rights and Preference

(a) Except as otherwise set forth herein, upon the voluntary or involuntary dissolution, liquidation or winding up of Freddie Mac, after payment of or provision for the liabilities of Freddie Mac and the expenses of such dissolution, liquidation or winding up, the holders of the outstanding shares of the Non-Cumulative Preferred Stock shall be entitled to receive out of the assets of Freddie Mac available for distribution to stockholders, before any payment or distribution shall be made on the Common Stock or any other class or series of stock of Freddie Mac ranking junior to the Non-Cumulative Preferred Stock upon liquidation, the amount of [the stated value] per share plus an amount . . . equal to the dividend, if any, otherwise payable for the then-current Dividend Period accrued through and including the date of payment in respect of such dissolution, liquidation or winding up, and the holders of the outstanding shares of any class or series of stock of Freddie Mac ranking on a parity with the Non-Cumulative Preferred Stock upon liquidation shall be entitled to receive out of the assets of Freddie Mac available for distribution to stockholders, before any such payment or distribution shall be made on the Common Stock or any other class or series of stock of Freddie Mac ranking junior to the Non-Cumulative Preferred Stock and to such parity stock upon liquidation, any corresponding preferential amount to which the holders of such parity stock may, by the terms thereof, be entitled; provided, however, that if the assets of Freddie Mac available for distribution to stockholders shall be insufficient for the payment of the amount which the holders of the outstanding shares of the Non-Cumulative Preferred Stock and the holders of the outstanding shares of such parity stock shall be entitled to receive upon such dissolution, liquidation or winding up of Freddie Mac as aforesaid, then . . . all of the assets of Freddie Mac available for distribution to stockholders shall be distributed to the holders of outstanding shares of the Non-Cumulative Preferred Stock and to the holders of outstanding shares of such parity stock pro rata, so that the amounts so distributed to holders of the Non-Cumulative Preferred Stock and to holders of such classes or series of such parity stock, respectively, shall bear to each other the same ratio that the respective distributive amounts to which they are so entitled bear to each other.

41.    The Certificate of Designation for each series of Fannie Mae preferred stock also contains the following provisions governing amendments to the terms of the Fannie Mae preferred stock:

### 7. Voting Rights; Amendments.

* * *

(b) Without the consent of the Holders of [the particular series of] Preferred Stock, Fannie Mae will have the right to amend, alter, supplement or repeal any terms of this Certificate or the [particular series of] Preferred Stock (1) to cure any ambiguity, or to cure, correct or supplement any provision contained in this Certificate of Designation that may be defective or inconsistent with any other provision herein or (2) to make any other provision with respect to matters or questions arising with respect to the [particular series of] Preferred Stock that is not inconsistent with the provisions of this Certificate of Designation *so long as such action does not materially and adversely affect the interests of the Holders of [the particular series of] Preferred Stock*; provided, however, that any increase in the amount of authorized or issued [particular series of] Preferred Stock or the creation and issuance, or an increase in the authorized or issued amount, of any other class or series of stock of Fannie Mae, whether ranking prior to, on a parity with or junior to the [particular series of] Preferred Stock, as to the payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, or otherwise, will not be deemed to materially and adversely affect the interests of the Holders of [the particular series of] Preferred Stock.

(c) *Except as set forth in paragraph (b) of this Section 7, the terms of this Certificate or the [particular series of] Preferred Stock may be amended, altered, supplemented, or repealed only with the consent of the Holders of at least two-thirds of the shares of [the particular series of] Preferred Stock then outstanding*, given in person or by proxy, either in writing or at a meeting of stockholders at which the Holders of [the particular series of] Preferred Stock shall vote separately as a class. On matters requiring their consent, Holders of [the particular series of] Preferred Stock will be entitled to one vote per share.

(Emphasis added).

42.     Likewise, the Certificate of Designation for each series of Freddie Mac preferred stock contains the following provisions governing amendments to the terms of the Freddie Mac preferred stock:

**9. Miscellaneous**

\* \* \*

(h) Freddie Mac, by or under the authority of the Board of Directors, may amend, alter, supplement or repeal any provision of this Certificate pursuant to the following terms and conditions:

(i) Without the consent of the holders of the Non-Cumulative Preferred Stock, Freddie Mac may amend, alter, supplement or repeal any provision of this Certificate to cure any ambiguity, to correct or supplement any provision herein which may be defective or inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Certificate, *provided that such action shall not materially and adversely affect the interests of the holders of the Non-Cumulative Preferred Stock.*

(ii) *The consent of the holders of at least 66 2/3% of all of the shares of the Non-Cumulative Preferred Stock at the time outstanding*, given in person or by proxy, either in writing or by a vote at a meeting called for the purpose at which the holders of shares of the Non-Cumulative Preferred Stock shall vote together as a class, *shall be necessary for authorizing, effecting or validating the amendment, alteration, supplementation or repeal of the provisions of this Certificate if such amendment, alteration, supplementation or repeal would materially and adversely affect the powers, preferences, rights, privileges, qualifications, limitations, restrictions, terms or conditions of the Non-Cumulative Preferred Stock.* The creation and issuance of any other class or series of stock, or the issuance of additional shares of any existing class or series of stock of Freddie Mac (including the Non-Cumulative Preferred Stock), whether ranking prior to, on a parity with or junior to the Non-Cumulative Preferred Stock, shall not be deemed to constitute such an amendment, alteration, supplementation or repeal.

(Emphasis added).

43.     Thus, the contracts governing all of the Junior Preferred Stock held by the Class provided that Fannie and Freddie, respectively, were prohibited from amending the terms of any of the Junior Preferred Stock in a way that was materially adverse to the Junior Preferred Stockholders.  The only exception to that requirement was if Fannie or Freddie issued a new class or series of stock.  In executing the Third Amendment, the FHFA, Fannie, and Freddie have not purported to issue a new series of stock, and therefore the contractual prohibition against amending the terms of the Junior Preferred Stock in a way that is materially adverse to the Junior Preferred Stockholders has been violated.  Indeed, if the Third Amendment in fact constituted the issuance of a new series of stock to the Treasury, then the Third Amendment was illegal, because the statutory authority allowing the Treasury to acquire new series of stock in Fannie and Freddie expired at the end of 2009.  12 U.S.C. §§ 1455(*l*)(4), 1719(g)(4).  Moreover, as shown below, there can be no doubt that the Third Amendment not only made "materially adverse" changes to rights of Junior Preferred Stockholders, but in fact *nullified* the contractual rights of such stockholders.

### The Conservatorships

44.     On September 7, 2008, OFHEO's Director James Lockhart, who then became director of the FHFA, announced that on the previous day (September 6, 2008), the FHFA had placed Fannie Mae and Freddie Mac into conservatorship.  Mr. Lockhart described "conservatorship" as "a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations. FHFA will act as the conservator to operate the Enterprises until they are stabilized."

45.     In his announcement, Mr. Lockhart explained that "in order to conserve over $2 billion in capital every year, the common stock and preferred stock dividends will be eliminated,

but the common and all preferred stocks will continue to remain outstanding. Subordinated debt interest and principal payments will continue to be made." Thus, the conservatorships did not involve the appropriation of any of the outstanding preferred stock in Fannie Mae or Freddie Mac. While Mr. Lockhart orally stated that dividends would be "eliminated," there was no amendment to any of the Certificates of Designation for any of the Fannie Mae or Freddie Mac Junior Preferred Stock (collectively, the "Certificates"). Thus, this oral announcement by Mr. Lockhart did not legally modify the contractual rights of the holders of Junior Preferred Stock. Moreover, as shown below, both Mr. Lockhart's announcement and the terms of the agreements executed between the Treasury and the FHFA contemplated that future dividends could potentially be paid on the Junior Preferred Stock if the institutions returned to profitability.

46.     Mr. Lockhart's announcement also made clear that the conservatorships would be run with a view to attracting continued private investment into Fannie Mae and Freddie Mac: "Some of the key regulations will be minimum capital standards, prudential safety and soundness standards and portfolio limits. It is critical to complete these regulations *so that any new investor will understand the investment proposition.*"

47.     Also on September 7, 2008, Treasury Secretary Henry Paulson announced that in connection with the conservatorships, Fannie Mae and Freddie Mac had entered into the Agreements with the Treasury Department pursuant to which the Treasury Department would receive a newly-issued series of preferred stock that would be senior in priority to all the issued and outstanding series of Fannie Mae and Freddie Mac preferred stock. Mr. Paulson explained that "With this agreement, Treasury receives senior preferred equity shares and warrants that protect taxpayers. Additionally, under the terms of the agreement, common and preferred shareholders bear losses ahead of the new government senior preferred shares." Mr. Paulson

made clear that "*conservatorship does not eliminate the outstanding preferred stock*, but does place preferred shareholders second, after the common shareholders, in absorbing losses."

48.    Also on September 7, 2008, the Treasury Department issued a "Fact Sheet" describing the Agreements and explaining that the Agreements "provide significant protections for the taxpayer, in the form of senior preferred stock with a liquidation preference, an upfront $1 billion issuance of senior preferred stock with a 10% coupon from each GSE, quarterly dividend payments, warrants representing an ownership stake of 79.9% in each GSE going forward, and a quarterly fee starting in 2010."

49.    The Fact Sheet further stated that "The agreements are contracts between the Department of the Treasury and each GSE."  It then summarized the terms of the Agreements, and clearly itemized each form of compensation being received by Treasury under the Agreements:

> In exchange for entering into these agreements with the GSEs, Treasury will immediately receive the following compensation:
>
> ◦    $1 billion of senior preferred stock in each GSE
>
> ◦    Warrants for the purchase of common stock of each GSE representing 79.9% of the common stock of each GSE on a fully-diluted basis at a nominal price
>
> •    The senior preferred stock shall accrue dividends at 10% per year. The rate shall increase to 12% if, in any quarter, the dividends are not paid in cash, until all accrued dividends have been paid in cash.
>
> •    The senior preferred stock shall not be entitled to voting rights. In a conservatorship, voting rights of all stockholders are vested in the Conservator.
>
> •    Beginning March 31, 2010, the GSEs shall pay the Treasury on a quarterly basis a periodic commitment fee that will compensate the Treasury for the explicit support provided by the agreement. The Secretary of the Treasury and the Conservator shall determine

the periodic commitment fee in consultation with the Chairman of
the Federal Reserve. This fee may be paid in cash or may be added
to the senior preferred stock.

50.     In addition, the Fact Sheet summarized a series of "covenants" made by Fannie

Mae and Freddie Mac to Treasury as part of the Agreements, including the covenant that,

"Without the prior consent of the Treasury, the GSEs shall not ...... Make any payment to

purchase or redeem its capital stock, or pay any dividends, including preferred dividends (other

than dividends on the senior preferred stock)."  Notably, there was no covenant that prohibited

any future payment of dividends to holders of the Junior Preferred Stock; nor was there any

indication at all that the Treasury would refuse to consent to any dividends ever being paid on

the Junior Preferred Stock even if Fannie and Freddie returned to profitability and were able to

repay the Treasury its entire investment plus a substantial profit.   Moreover, there was no

covenant preventing Junior Preferred Stockholders from receiving their pro rata share of any

liquidation value in Fannie Mae or Freddie Mac.

51.     On September 11, 2008, Fannie Mae filed with the SEC a Form 8-K disclosing

further details regarding its conservatorship and Preferred Stock Purchase Agreement with the

Treasury Department.   Among other things, this Form 8-K stated that "FHFA, as Conservator,

has the power to repudiate contracts entered into by Fannie Mae prior to the appointment of

FHFA as Conservator if FHFA determines, in its sole discretion, that performance of the contract

is burdensome and that repudiation of the contract promotes the orderly administration of Fannie

Mae's affairs. FHFA's right to repudiate any contract must be exercised within a reasonable

period of time after its appointment as Conservator."  FHFA did not, either within a reasonable

period of time of its appointment as Conservator or at any other time before August 17, 2012,

purport to repudiate any of the contracts governing the issuance by Fannie Mae and Freddie Mac

of the various series of preferred stock listed above and now described as the Junior Preferred

Stock. No such repudiation occurred until the imposition of the Net Worth Sweep on August 17,

2012, which was not a reasonable period of time following the appointment of FHFA as

Conservator for Fannie and Freddie.

52.     In summarizing the terms applicable to the Senior Preferred Stock issued to

Treasury, the Form 8-K stated:

> The Senior Preferred Stock ranks prior to Fannie Mae common
> stock and all outstanding series of Fannie Mae preferred stock
> (which are listed in Item 3.03 above), as well as any Fannie Mae
> capital stock issued in the future, *as to both dividends and rights
> upon liquidation.* The Certificate of Designation for the Senior
> Preferred Stock provides that Fannie Mae may not, at any time,
> declare or pay dividends on, make distributions with respect to, or
> redeem, purchase or acquire, or make a liquidation payment with
> respect to, any common stock or other securities ranking junior to
> the Senior Preferred Stock unless (a) full cumulative dividends on
> the outstanding Senior Preferred Stock in respect of the then-
> current dividend period and all past dividend periods (including
> any unpaid dividends added to the liquidation preference) have
> been declared and paid in cash, and (b) all amounts required to be
> paid with the net proceeds of any issuance of capital stock for cash
> have been paid in cash.

> (Emphasis added).

53.     Thus, the terms of the Agreements governing the Senior Preferred Stock issued to

Treasury (as summarized in the Form 8-K) contemplated that it would be possible to pay

dividends to the Junior Preferred Stockholders, so long as all cumulative dividends had been paid

in cash on the Senior Preferred Stock and Treasury's "Commitment" to provide funding had

terminated, *e.g.*, in connection with redemption of the Senior Preferred Stock.

54.     The Form 8-K's summary of the Agreements governing the Senior Preferred

Stock also contemplated that the Senior Preferred Stock would be redeemed at some future date

in connection with the termination of the Treasury's "Commitment" to provide funding: "If after

termination of the Commitment, Fannie Mae pays down the liquidation preference of each outstanding share of Senior Preferred Stock in full, the shares will be deemed to have been redeemed as of the payment date."

### Fannie Mae and Freddie Mac's Debt to the Government<br>Balloons to More Than $188 Billion

55.     Since Fannie Mae and Freddie Mac have been in conservatorship, the Treasury Department has caused Fannie Mae and Freddie Mac to draw billions of dollars from the Government.  The funds drawn from the Government have been added to the original $1 billion face value of the Government's Senior Preferred Stock in each of Fannie Mae and Freddie Mac, and have thereby increased exponentially the amount Fannie Mae and Freddie Mac must eventually pay the Government to redeem their respective Senior Preferred Stock.  To a large degree, the billions in dollars of funding from Treasury reflects (a) excessive write downs of the assets held by Fannie and Freddie which triggered losses that are now being reversed, as it turns out that these assets were worth substantially more than their written down values; and (b) the need to borrow cash from Treasury in order to pay Treasury its 10% annual coupon on its Senior Preferred Stock.

56.     On February 26, 2009, Fannie Mae filed with the SEC its Form 10-K for the fiscal year ended December 31, 2008, which disclosed that "[a]t December 31, 2008, our total liabilities exceeded our total assets, as reflected on our consolidated balance sheet, by $15.2 billion," and therefore "[t]he Director of FHFA submitted a request on February 25, 2009 for funds from Treasury on our behalf under the terms of the senior preferred stock purchase agreement to eliminate our net worth deficit as of December 31, 2008. . . .  Accordingly, the amount of the aggregate liquidation preference of the senior preferred stock will increase to $16.2 billion as a result of our expected draw."

57.     On March 11, 2009, Freddie Mac filed with the SEC its Form 10-K for the fiscal year ended December 31, 2008, which disclosed that "[t]he Director of FHFA has submitted a draw request to Treasury under the Purchase Agreement in the amount of $30.8 billion, which we expect to receive in March 2009.  When this draw is received . . . the aggregate liquidation preference of the senior preferred stock will increase from $1.0 billion as of September 8, 2008 to $45.6 billion."

58.     On February 24, 2010, Freddie Mac filed with the SEC its Form 10-K for the fiscal year ended December 31, 2009, which disclosed that "[a]s a result of draws under the Purchase Agreement, the aggregate liquidation preference of the senior preferred stock has increased from $1.0 billion as of September 8, 2008 to $51.7 billion as of December 31, 2009."

59.     On February 26, 2010, Fannie Mae filed with the SEC its Form 10-K for the fiscal year ended December 31, 2009, which disclosed that "the aggregate liquidation preference of the senior preferred stock was $60.9 billion as of December 31, 2009 and will increase to $76.2 billion as a result of FHFA's request on our behalf for funds to eliminate our net worth deficit as of December 31, 2009."

60.     On February 24, 2011, Fannie Mae filed with the SEC its Form 10-K for the fiscal year ended December 31, 2010, which disclosed that "the aggregate liquidation preference of the senior preferred stock was $88.6 billion as of December 31, 2010 and will increase to $91.2 billion as a result of FHFA's request on our behalf for funds to eliminate our net worth deficit as of December 31, 2010."

61.     On February 24, 2011, Freddie Mac filed with the SEC its Form 10-K for the fiscal year ended December 31, 2010, which disclosed that "[t]he draws received during 2010 increased the aggregate liquidation preference of the senior preferred stock to $64.2 billion at

December 31, 2010 from $51.7 billion at December 31, 2009.  To address our net worth deficit of $401 million as of December 31, 2010, FHFA, as Conservator, will submit a draw request, on our behalf, to Treasury under the Purchase Agreement in the amount of $500 million. Upon funding of the draw request . . . our aggregate funding received from Treasury under the Purchase Agreement will increase to $63.7 billion."

62.     On February 29, 2012, Fannie Mae filed with the SEC its Form 10-K for the fiscal year ended December 31, 2011, which disclosed that "the aggregate liquidation preference of the senior preferred stock was $112.6 billion as of December 31, 2011 and will increase to $117.1 billion as a result of FHFA's request on our behalf for funds to eliminate our net worth deficit as of December 31, 2011."

63.     On March 9, 2012, Freddie Mac filed with the SEC its Form 10-K for the fiscal year ended December 31, 2011, which disclosed that "[w]e had a net worth deficit of $146 million as of December 31, 2011, and, as a result, FHFA, as Conservator, will submit a draw request, on our behalf, to Treasury under the Purchase Agreement in the amount of $146 million. Upon funding of the draw request . . . our aggregate liquidation preference on the senior preferred stock owned by Treasury will increase to $72.3 billion."

64.     Thus, as of the beginning of 2012, Fannie Mae's cost to redeem the Government's Senior Preferred Stock in Fannie had ballooned from the original $1 billion to $117.1 billion, and Freddie Mac's cost to redeem the Government's Senior Preferred Stock in Freddie had increased from the original $1 billion to $72.3 billion—resulting in a total face amount (and liquidation preference) for the Government's Senior Preferred Stock in both Fannie and Freddie of approximately $189.4 billion.

65.     Nevertheless, while the Treasury's large infusions of cash into Fannie and Freddie created substantial priority rights for the Senior Preferred Stock, it did not eliminate the rights of the Junior Preferred Stock, which continued to be entitled to dividends payable after all dividends paid on the Senior Preferred Stock, and to a liquidation preference after the liquidation preference on the Senior Preferred Stock was satisfied.  For example, as of March 31, 2013, the aggregate liquidation preference of all of the Junior Preferred Stock in Fannie and Freddie was approximately $33 billion.  As shown below, the growing profitability of Fannie and Freddie during 2012 soon confirmed that, despite being junior to the Treasury's Senior Preferred Stock, the Junior Preferred Stock was worth billions of dollars.

**Fannie Mae and Freddie Mac Become Profitable**

66.     After three years in conservatorship, both Fannie Mae and Freddie Mac began to report significant profits, reflecting the recovery of the broader housing market and the increased value of the assets that both Fannie and Freddie had been forced to write down.  Thus, by the first quarter of 2012, Fannie Mae had no need to draw additional funds from the Government because instead of generating losses, it began generating profits.

67.     On May 9, 2012, Fannie Mae filed with the SEC its Form 10-Q for the first quarter of 2012, which disclosed Fannie Mae's first quarterly profit since before the conservatorship.  In the Form 10-Q Fannie Mae reported "total comprehensive income of $3.1 billion in the first quarter of 2012, consisting of net income of $2.7 billion and other comprehensive income of $362 million" and "net worth of $268 million as of March 31, 2012 [which] reflects our total comprehensive income of $3.1 billion largely offset by our payment to Treasury of $2.8 billion in senior preferred stock dividends during the first quarter of 2012." Fannie Mae further reported that "[a]s a result of our positive net worth as of March 31, 2012, we

will not request a draw this quarter from Treasury under the senior preferred stock purchase agreement."

68.     Fannie Mae's profitability grew in the second quarter of 2012.  On August 8, 2012, Fannie Mae filed with the SEC its Form 10-Q for the second quarter of 2012, in which Fannie Mae reported "comprehensive income of $5.4 billion in the second quarter of 2012, consisting of net income of $5.1 billion and other comprehensive income of $328 million" and "net worth of $2.8 billion as of June 30, 2012 [which] reflects our comprehensive income of $8.5 billion offset by our payment to Treasury of $5.8 billion in senior preferred stock dividends during the first half of 2012. . . .  As a result of our positive net worth as of June 30, 2012, we are not requesting a draw from Treasury under the senior preferred stock purchase agreement."

69.     Although Freddie Mac was also in conservatorship and had to draw on the Government's funding commitment to pay the Government dividends on the Government's senior preferred stock, Freddie Mac was able to generate quarterly profits for certain quarters even before 2012.  For example, in its Form 10-Q for the quarter ended June 30, 2009, filed with the SEC on August 7, 2009, Freddie Mac reported a quarterly profit of $800 million, and in its Form 10-Q for the quarter ended March 30, 2011, filed with the SEC on May 4, 2011, Freddie Mac reported a quarterly profit of $2.7 billion.

70.     By the first quarter of 2012, Freddie Mac began to generate quarterly profits on a consistent basis.  In its Form 10-Q for the quarter ended March 30, 2012, filed with the SEC on May 3, 2012, Freddie Mac reported a quarterly profit of $1.8 billion, and in its Form 10-Q for the quarter ended June 30, 2012, filed with the SEC on August 7, 2012, Freddie Mac reported a quarterly profit of $2.9 billion.

### The Net Worth Sweep

71.     With Fannie Mae and Freddie Mac's return to consistent profitability, the holders of Fannie Mae and Freddie Mac Junior Preferred Stock began to see some light at the end of the tunnel.  Although Fannie Mae and Freddie Mac were still in conservatorship, Fannie Mae and Freddie Mac's rapidly growing profitability and net worth gave the Junior Preferred Stockholders reason to believe that Fannie Mae and Freddie Mac would soon be financially healthy enough to begin paying dividends on the Junior Preferred Stock even after paying the 10% annual dividend on the Treasury's Senior Preferred Stock (as Fannie and Freddie were able to do as of no later than the second quarter of 2012), or to redeem the Government's Senior Preferred Stock, exit conservatorship, and resume paying regular dividends on the Junior Preferred Stock.  Alternatively, even if Fannie and Freddie were gradually wound down or liquidated, their profitability reflected the value of their underlying assets, and any reasonable liquidation would generate more than enough value to pay off the Senior Preferred Stock held by the Treasury while yielding substantial additional value for the holders of Junior Preferred Stock.

72.     Thus, the return of Fannie and Freddie to substantial and consistent profitability in 2012 led to an increase in the trading prices of the Fannie Mae and Freddie Mac Junior Preferred Stock, which began to increase substantially, on average by 83% and 86%, respectively, from the beginning of May 2012 to August 2012, as demonstrated below:

**Fannie Mae**

| Series | 5/1/12 Closing Price | 8/16/12 Closing Price | % Change |
|--------|----------------------|-----------------------|----------|
| F      | $1.95                | $3.25                 | +67%     |
| G      | $1.95                | $3.31                 | +70%     |
| H      | $1.95                | $3.50                 | +79%     |

| | | | |
|---|---|---|---|
| I | $2.05 | $3.42 | +67% |
| L | $1.80 | $3.40 | +89% |
| M | $1.81 | $3.22 | +78% |
| N | $1.82 | $3.25 | +79% |
| O | $2.11 | $3.30 | +56% |
| P | $1.04 | $1.90 | +83% |
| Q | $0.98 | $1.99 | +115% |
| R | $1.01 | $1.95 | +93% |
| S | $1.19 | $2.35 | +97% |
| T | $1.30 | $2.65 | +104% |

**Freddie Mac**

| Series | 5/1/12 Closing Price | 8/16/12 Closing Price | % Change |
|---|---|---|---|
| B | $1.80 | $3.18 | +77% |
| 5.81% (1997) | $1.55 | $3.30 | +113% |
| F | $1.80 | $3.45 | +92% |
| G | $1.80 | $3.25 | +81% |
| H | $1.90 | $3.55 | +87% |
| 5.3% (1998) | $1.80 | $3.95 | +119% |

| | | | |
|---|---|---|---|
| 5.1% (1999) | $2.75 | $2.90 | +5% |
| K | $1.83 | $3.55 | +94% |
| L | $2.00 | $3.30 | +65% |
| M | $1.82 | $3.00 | +65% |
| N | $1.95 | $3.30 | +69% |
| O | $1.83 | $3.35 | +83% |
| P | $1.90 | $3.93 | +107% |
| Q | $1.85 | $3.24 | +75% |
| R | $1.82 | $3.95 | +117% |
| 5.81% (2002) | No historical data | No historical data | N/A |
| S | $2.00 | $3.20 | +60% |
| T | $1.85 | $3.85 | +108% |
| U | $1.25 | $2.30 | +84% |
| V | $1.25 | $2.20 | +76% |
| W | $1.01 | $1.90 | +88% |
| X | $1.01 | $1.86 | +84% |
| Y | $1.03 | $2.11 | +105% |
| Z | $1.18 | $2.83 | +140% |

73.     Indeed, even the increased prices for the Junior Preferred Stock shown above likely understated the true value of the Junior Preferred Stock as of August 2012.  The Junior Preferred Stock had been de-listed during the conservatorship, leading to a less liquid market that in many instances fails to reflect accurately the true value of the underlying security. Nevertheless, the overall increase in pricing did reflect the clear market reality that Fannie and Freddie had become profitable again, there was (and is) every reason to believe that profitability will continue and increase over time, and their combined profits would be more than sufficient to satisfy all financial obligations attributable to the Senior Preferred Stock (whether through ongoing dividends, redemptions, liquidation preferences or otherwise) while still yielding substantial additional value for the Junior Preferred Stockholders.

74.     The optimistic mood came to a crashing halt on August 17, 2012, when the Treasury Department issued a news release announcing that Fannie and Freddie had agreed to a Third Amendment to the Senior Preferred Stock Agreements that, among other things, increased the dividends Fannie Mae and Freddie Mac are required to pay the Government from 10% of the value of the Senior Preferred Stock to an *unlimited amount* equal to Fannie Mae and Freddie Mac's *entire net worth*.

75.     The Treasury described the terms of this Third Amendment, described herein as the "Net Worth Sweep," as a "*Full Income Sweep of All Future Fannie Mae and Freddie Mac Earnings to Benefit Taxpayers for Their Investment,*" and stated that "***The agreements will replace the 10 percent dividend payments made to Treasury on its preferred stock investments in Fannie Mae and Freddie Mac with a quarterly sweep of every dollar of profit that each firm earns going forward.***"  Specifically, as shown below, the Net Worth Sweep provides that beginning as of January 1, 2013, Fannie and Freddie must pay Treasury a quarterly dividend

equal to their *entire net worth,* minus a capital reserve amount that starts at $3 billion and decreases to $0 by January 1, 2018.  This means that any increase in the net worth of Fannie or Freddie flowing from net income or other comprehensive income will automatically be swept to the Treasury *in its entirety*, no matter how large that increase in net worth is, or how much it exceeds the 10% dividend provided for in the Agreements governing the Senior Preferred Stock.

76.     The Treasury stated that one of the objectives of the Net Worth Sweep was "*Making sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers for their investment in those firms*."  In other words, the purpose was to take any and all profits of Fannie and Freddie, no matter how much they exceeded the actual rights given to Treasury through its Senior Preferred Stock, and to leave absolutely nothing for the holders of the Junior Preferred Stock.

77.     The Treasury also stated that the Net Worth Sweep was designed to fulfill the "*the commitment made in the Administration's 2011 White Paper that the GSEs will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form*."  Thus, the Treasury's intent is to ensure that Fannie and Freddie can never generate profits for the holders of the Junior Preferred Stockholders.

78.     The Treasury also stated that the Net Worth Sweep would require Fannie and Freddie to wind down their mortgage portfolios at a faster rate than previously required:

> *Accelerated Wind Down of the Retained Mortgage Investment Portfolios at Fannie Mae and Freddie Mac*
>
> The agreements require an accelerated reduction of Fannie Mae and Freddie Mac's investment portfolios. Those portfolios will now be wound down at an annual rate of 15 percent - an increase from the 10 percent annual reduction required in the previous agreements. As a result of this change, the GSEs' investment portfolios must be reduced to the $250 billion target set in the previous agreements four years earlier than previously scheduled.

79.     Also on August 17, 2012, Fannie Mae filed with the SEC a Form 8-K disclosing

further details of the Third Amendment to the Agreement and the Net Worth Sweep:

> For each dividend period from January 1, 2013 through and
> including December 31, 2017, *the dividend amount will be the
> amount, if any, by which our net worth as of the end of the
> immediately preceding fiscal quarter exceeds an applicable
> capital reserve amount. The applicable capital reserve amount
> will be $3 billion for 2013 and will be reduced by $600 million
> each year until it reaches zero on January 1, 2018.* For each
> dividend period thereafter, the dividend amount will be the amount
> of our net worth, if any, as of the end of the immediately preceding
> fiscal quarter.
>
> Our net worth as defined by the agreement is the amount, if any,
> by which our total assets (excluding Treasury's funding
> commitment and any unfunded amounts related to the
> commitment) exceed our total liabilities (excluding any obligation
> in respect of capital stock), in each case as reflected on our balance
> sheet prepared in accordance with generally accepted accounting
> principles. If we do not have a positive net worth or if our net
> worth does not exceed the applicable capital reserve amount as of
> the end of a fiscal quarter, then no dividend amount will accrue or
> be payable for the applicable dividend period.
>
> * * *
>
> In addition to the above-described amendments, the amendment
> also requires that Fannie Mae amend or replace the existing
> Certificate of Designation for the senior preferred stock to reflect
> the revised dividend payment provisions described above by no
> later than September 30, 2012.
>
> (Emphasis added).

80.     The Net Worth Sweep eliminates the entire economic value of the Junior

Preferred Stock.  It literally appropriates for the benefit of the Treasury all of the economic value

that could ever be paid out on the Junior Preferred Stock, and makes it impossible for the Junior

Preferred Stock ever to receive a dividend or any other form of distribution from either Fannie or

Freddie, whether in liquidation or otherwise.  It therefore understandably had a devastating effect

on the over-the–counter trading prices of shares of the Fannie Mae and Freddie Mac Junior

Preferred Stock series, all of which immediately collapsed by well over 50% the day the Net

Worth Sweep was announced.

### Fannie Mae and Freddie Mac and Their Conservator FHFA Breached The Contractual Obligations to the Junior Preferred Stockholders

81.     Through the Third Amendment, Fannie and Freddie and their Conservator FHFA

eliminated the Junior Preferred Stockholders' contractual rights to receive dividends before the

Government could receive any dividends in excess of its 10% cumulative dividend on the Senior

Preferred stock, and to receive a pro rata distribution of any liquidation proceeds available after

the Government received full recovery of the face amount of the Senior Preferred Stock.  Thus,

the Third Amendment constituted an amendment, alteration, and repeal of the terms of the

Certificates, *e.g.*, the contractual terms governing the holders' rights to receive dividends and

liquidation distributions, in a manner that materially and adversely affected – indeed, totally

obliterated – the rights and interests of the holders of the Junior Preferred Stock.

82.     In breach of the terms of the Certificates, Fannie and Freddie and their

Conservator FHFA amended, altered, and repealed the terms of the Certificates in a manner that

materially and adversely affected the rights and interests of the holders of the Junior Preferred

Stock without seeking or obtaining the consent of two-thirds of the Junior Preferred Stockholders

as required by Section 7(c) of the Fannie Certificate and Section 9(h)(ii) of the Freddie

Certificate.

83.     Fannie and Freddie's agreement to the Net Worth Sweep did not purport to be the

creation and issuance of any other class or series of Fannie Mae or Freddie Mac stock, nor did it

purport to be an increase in the authorized or issued amount of any other class or series of Fannie

Mae or Freddie Mac stock.   Rather, the Net Worth Sweep to which Fannie and Freddie agreed in

August 2012 was described merely as an amendment to the terms of the Senior Preferred Stock that Fannie and Freddie had issued in September 2008. Accordingly, the amendment, alteration, and repeal of the terms of the Certificates via Fannie and Freddie's agreement to the Net Worth Sweep cannot be deemed exempt from the two-thirds vote requirement set forth in Section 7(c) of the Fannie Certificate and Section 9(h)(ii) of the Freddie Certificate.

84.    In addition to their explicit terms, inherent in the Certificates was an implied covenant by Fannie and Freddie to deal fairly with the Junior Preferred Stockholders and to fulfill the issuers' contractual obligations in good faith, *e.g.*, an implied promise that Fannie and Freddie would not take actions that would make it impossible for the Junior Preferred Stockholders to realize any value from their dividend and liquidation rights.

85.    Fannie and Freddie and their Conservator FHFA acted unfairly and in bad faith with respect to the Junior Preferred Stockholders and breached their implied covenant of good faith and fair dealing by agreeing to the Net Worth Sweep, the purpose and effect of which was to make it *impossible* for the Junior Preferred Stockholders to realize any value from their dividend and liquidation rights, and thus to deny the Junior Preferred Stockholders the fruits of their contracts with Fannie and Freddie.

86.    As a direct and proximate result of the foregoing breaches, Plaintiffs and the Class have been deprived of the entire economic value of the Junior Preferred Stock.

<u>COUNT I</u>

**Against Fannie Mae, Freddie Mac, and FHFA, as Conservator of Fannie and Freddie**
**<u>for Breach of Contract</u>**

87.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

88.     The Certificates are contracts between the holders of Junior Preferred Stock, *i.e.*, Plaintiffs and the members of the Class, and Fannie and Freddie.

89.     Fannie, Freddie, and their Conservator FHFA breached the terms of the Certificates by amending, altering, and repealing the terms of the Certificates in a manner that materially and adversely affected the rights and interests of Plaintiffs and the members of the Class without seeking or obtaining the consent of Plaintiffs and the members of the Class, as alleged herein.

90.     As a direct and proximate result of the foregoing breach of contract, Plaintiffs and the members of the Class sustained damages, as alleged herein.

<u>COUNT II</u>

**Against Fannie Mae, Freddie Mac, and FHFA, as Conservator of Fannie and Freddie
for Breach of the Implied Covenant of Good Faith and Fair Dealing**

91.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

92.     Inherent in the Certificates was an implied covenant by Fannie and Freddie to deal fairly with the holders of Junior Preferred Stock, *i.e.*, Plaintiffs and the members of the Class, and to fulfill their contractual obligations in good faith, *e.g.*, an implied promise not to take actions that would make it impossible for Plaintiffs and the members of the Class to realize any value from their dividend and liquidation rights.

93.     Fannie, Freddie, and their Conservator FHFA acted unfairly and in bad faith with respect to the Junior Preferred Stockholders and breached their implied covenant of good faith and fair dealing by agreeing to the Net Worth Sweep, the purpose and effect of which was to make it impossible for the Junior Preferred Stockholders to realize any value from their dividend

and liquidation rights, and thus to deny the Junior Preferred Stockholders the fruits of their contracts with Fannie and Freddie, as alleged herein.

94.     As a direct and proximate result of the foregoing breach of the implied covenant of good faith and fair dealing, Plaintiffs and the members of the Class have sustained damages, as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.     Certifying this action as a class action and Plaintiffs as Class representatives;

B.     Awarding Plaintiffs and the Class the amount of damages they sustained as a result of defendants' breaches of contract and breaches of the implied covenant of good faith and fair dealing;

C.     Granting appropriate equitable and injunctive relief to remedy defendants' breaches of contract and breaches of the implied covenant of good faith and fair dealing;

D.     Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, experts' fees, costs, and other expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Respectfully submitted,

**BOIES, SCHILLER & FLEXNER LLP**

/s/ Hamish P.M. Hume
Hamish P.M. Hume
5301 Wisconsin Ave., NW, Suite 800
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131

**KESSLER TOPAZ MELTZER
& CHECK, LLP**
Lee D. Rudy
Eric L. Zagar
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiffs*

Date:   July 29, 2013